UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MAINEGENERAL MEDICAL CENTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 07-40-B-K |
| | ) | |
| ERIC HANSEN, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF DECISION**[1]

MaineGeneral Medical Center has sued Eric Hensen, M.D., in a three-count complaint for breach of contract, unjust enrichment, and conversion. According to the allegations in the complaint, Hensen is an otolaryngologist who entered into a Physician Recruitment Agreement with MaineGeneral in which MaineGeneral agreed to guarantee Hensen a net income of $250,000.00 per year over a period of two years, to be paid in the form of monthly advances based upon Hensen's monthly practice receipts, net of his monthly practice expenses. These payments were structured as a loan, with a provision that if Hensen remained in the service area for thirty-six months following the end of the two year period, the loan and accrued interest would be completely forgiven.

Hensen came to Maine and established a medical practice which he left within one year. MaineGeneral alleges it advanced $374,929.35 under the contract and that Hensen has refused to execute the promissory note required by the contract and has not made any repayments on the loan. Hensen claims that the Physician Recruitment Agreement is void or voidable because of fraud in the inducement and material misrepresentation or, alternatively, that enforcement of the

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

1

contract is barred by mutual mistake. This matter is before the court on MaineGeneral's motion for summary judgment. (Docket No. 14.) I now deny the motion.

## Statement of Undisputed Facts

The following statement of facts is drawn from the parties' Local Rule 56 statements of material fact in accordance with this District's summary judgment practice. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). When a statement offered by a party is uncontested and is supported by a citation to record material having evidentiary quality, the statement has been set forth herein essentially as offered. When a statement of fact is contested and the evidentiary record is capable of supporting alternative findings of fact, the statement in dispute has been characterized for purposes of summary judgment in the manner that favors the non-movant. Merch. Ins. Co. v. U. S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

On June 16, 2005, Eric Hensen, D.O. and MaineGeneral Medical Center entered into a Physician Recruitment Agreement ("the Contract"). The Contract sets forth the responsibilities of Dr. Hensen in sections 1 through 4. The hospital's responsibilities are set forth in sections 5 through 9. The general provisions governing the relationship between the parties are set forth in sections 10 through 23. As part of the Contract, the parties agreed to a "guarantee period" during which the hospital guaranteed a specified level of net income to Dr. Hensen. The guarantee period started on the date Dr. Hensen commenced practice in the hospital's service area and ran for two years thereafter. The amount of net income guaranteed to Dr. Hensen by the hospital was specified in Schedule A of the Contract. The maximum amount of the net income guarantee was set at Seven Hundred Five Thousand Fifty-Three Dollars ($705,053.00) per year.

The Contract specifies a mechanism for the calculation and payment of an advance against the net income guarantee by the hospital to Dr. Hensen.  The Contract specifies a calculation for repayment due the hospital by Dr. Hensen should he cease to practice within the hospital's service area within the two-year guarantee period.  The Contract specifies that Dr. Hensen must execute a promissory note in favor of the hospital for the amount of the repayment due, and secure that note by his accounts receivable and personal assets, if necessary.  During the guarantee period, the hospital paid Three Hundred Sixty-Two Thousand Twenty-Three Dollars and Nine Cents ($362,023.09) in advances to or on behalf of Dr. Hensen.

Dr. Hensen understood that under the terms of the Contract he was required to establish a full-time practice in the specialty of otolaryngology to serve patients in the hospital's service area for multiple years to avoid having to repay the hospital's advances.  The Contract specified that Dr. Hensen would obtain and maintain medical staff privileges as a member of the hospital's active medical staff for the term of the Contract.  The Contract specified that Dr. Hensen would engage in activities for the benefit of the hospital and communities served by the hospital.  The Contract specified that Dr. Hensen would actively participate in the hospital's programs aimed at monitoring and evaluating patient care.  The Contract specified that Dr. Hensen would assist the hospital and participate in its continuing and in-service educational programs for the hospital staff, its medical staff and other interested providers in the public.  The Contract specified that Dr. Hensen would make call coverage arrangements with another physician or physicians to assure adequate quick coverage of the needs of the hospital's patients in his field of specialty on a full-time basis.

Dr. Hensen started his practice in Augusta, Maine, in October of 2005.  On October 9, 2006, Dr. Hensen wrote a letter to the hospital's representative, Dr. Stephen Sears, informing

him that he would resign from his privileges at the hospital effective October 31, 2006. In his letter dated October 9, 2006, Dr. Hensen informed the hospital that he would no longer practice in the greater Augusta area and would relocate to another state. Dr. Hensen resigned from the hospital's active medical staff during the guarantee period of the Contract. Dr. Hensen closed his practice on or about October 31, 2006. During the two-year guarantee period of the Contract, Dr. Hensen ceased active participation in the hospital's programs aimed at monitoring and evaluating patient care by ceasing his practice in the greater Augusta area, ceased assisting the hospital in its continuing and in-service educational programs by ceasing his practice in the greater Augusta area, and ceased making call coverage arrangements as specified in the Contract when he ceased practicing in the greater Augusta area. Dr. Hensen failed or refused to execute the promissory note specified by the Contract to guarantee payment of advances made by the hospital to Dr. Hensen during the term of the agreement. Dr. Hensen has not repaid the Three Hundred Sixty-Two Thousand Twenty-Three Dollars and Nine Cents ($362,023.09) paid by the hospital to or on behalf of Dr. Hensen pursuant to the Contract.

The Contract represented[2] that the hospital had determined that an additional ENT on its medical staff would provide more efficient use of its facilities; meet an unmet need in the hospital service area; promote the health and well being of the community; and enhance the hospital's reputation for patient care. Eleven months before the execution of the Contract, Steven Sears, M.D., MaineGeneral's Chief Medical Officer, wrote Dr. Hensen that there was an opportunity for an ENT in the Augusta and Waterville area based upon a patient service area of approximately 150,000 people served by two ENT physicians. The two ENTs referenced by Dr. Sears were Dr. Seywerd and Dr. Chasse. As of August 2004, Dr. Sears did not know there were

---

[2] The plaintiff denies this statement, most probably because defendant uses the word "misrepresented" rather than "represented." The contract language is as indicated.

other ENTs providing service within the hospital's primary service area. Dr. Diehl provides ENT services in the Augusta area, working with Dr. Seywerd. Dr. Diehl's practice is non-surgical, but probably overlapped with Dr. Hensen's non-surgical professional services and patient base in the Augusta area. Dr. Sears told Dr. Hensen that Dr. Diehl would be a "non-factor" in terms of impact upon his practice. However, Dr. Diehl had a substantial impact on Dr. Hensen's ability to receive referrals for ENT patients from two family practice offices.

During the time Dr. Hensen was being recruited, MaineGeneral had a primary service area population of 136,992 people, and for internal review purposes, calculated that this population was served by two ENTs, Drs. Seywerd and Chasse. It takes between 40,000 and 50,000 people to support each practicing ENT, so to support three full-time ENTs requires a population base between 120,000-150,000 people. Dr. Sears wrote to Dr. Hensen while he was recruiting him that the hospital's patient base was approximately 150,000. Hensen says he was told the population base was 150,000 - 180,000 people. Hensen also maintains that Dr. Sears represented that one of the two ENTs was retiring soon, but Sears denies this assertion.

MaineGeneral's Director of Planning, Nancy Kiernan, provides support to the Physician Recruitment Committee, including calculation of the physician-to-patient ratio for specialty services. The number of physicians used in the ratio calculation should include all physicians practicing in the various specialties in the hospital service area, and not just those physicians on staff at MaineGeneral. Ms. Kiernan is not familiar with Dr. Diehl, an ENT that practices with Dr. Seywerd. The hospital does not include office based physicians without hospital privileges in its calculation. Ms. Kiernan follows that protocol because that is how it was done when she came to the job in 2002. Ms. Kiernan has never even heard Dr. Diehl discussed during Physician Recruitment Committee meetings, and has never heard his name discussed during any

discussions of ENT services. Ms. Kiernan includes Inland Hospital in Waterville and the physicians on its staff in calculating providers within the hospital service area. However, she was not aware that Inland had a physician on staff with an ENT specialty until after Hensen left the area. Inland did not list an ENT on its website prior to that time and Kiernan relied solely upon the website when making her calculations regarding ENTs in the area. Dr. Harry Payton, a Portland based ENT, has been providing ENT services at Inland Hospital in Waterville since at least 1999.[3] Dr. Sears was not aware of a Portland-based ENT practicing in Waterville prior to 2005 and he believes that the time spent by such a specialist at Inland was relatively small.

According to Valerie Aucoin, Dr. Diehl has been practicing with Dr. Seywerd since at least 1999. Dr. Sears believes Dr. Diehl was still practicing at the Veteran's Hospital around the time of his August 2004 letter to Dr. Hensen and he is not sure when Diehl began his non-surgical work with Seywerd. Hensen knew that Diehl worked with Seywerd but did not perform surgery.

The Hospital prepared financial projections for Dr. Hensen's practice while he was being recruited. The projections showed the practice would lose approximately $150,000 in the first year and approximately $80,000 in the second year. Dr. Sears discussed the financial projections for the practice with either Dr. Hensen or Dr. Hensen's accountant, Rex Rudolph, and discussed the fact that he thought the practice would be successful. The hospital feels it did everything it could to make Dr. Hensen's practice busier. Dr. Hensen's practice incurred a loss of net income of $362,023.09 currently demanded by the hospital, despite the fact that Dr. Hensen refused to

---

[3] MaineGeneral objects to this statement as inadmissible hearsay, but Valerie Aucoin, the declarant, has worked as a medical assistant for ENTs in the Augusta area since before 1999 and, based upon her personal knowledge, she says Dr. Payton has been providing services at Inland Hospital during that time frame. Dr. Sears, in his deposition, speculated that the ENT specialist at Inland did not come on the scene until the 2004-2005 time frame, contradicting Aucoin's statement. Both Ms. Aucoin and Dr. Sears have been in a position to have personal knowledge about ENTs working in the area. The record evidence thus presents a dispute of fact, which presumably could be fairly easily resolved by Dr. Payton or the appropriate representative of Inland Hospital itself. The objection is overruled.

accept further advances from the hospital beyond February 2006 to avoid further debt.  Dr. Hensen practiced in the hospital service area from October 2005 through October 2006, so the income support was not in place for the entire time, by Hensen's own election, even though the income guarantee portion of the contract ran for two years.

Hensen came to believe the primary service area for MaineGeneral was overstaffed with physicians practicing in the specialty of ENT after he was added to the mix, but the hospital continues to believe that another ENT specialist is needed in the area.  Rex Rudolph is an accountant who consulted with Dr. Hensen prior to his recruitment by MaineGeneral, and concerning his recruitment by MaineGeneral.  Mr. Rudolph has been designated as an expert witness by Dr. Hensen in this matter.   According to Rudolph, when Dr. Hensen signed the Physician Recruitment Agreement in 2005, the hospital service area did not require an additional full-time ENT because there were three full-time ENTs practicing in the primary service area. Dr. Hensen became the fourth full-time equivalent ENT.  Based upon a population base of 40,000-50,000 per ENT, there was not a need for Dr. Hensen's practice.  The three full-time equivalent physicians included Dr. Chasse and Dr. Seywerd, as well as Dr. Diehl on a part-time basis practicing from his office with Dr. Seywerd, combined with the Portland ENT seeing patients in Waterville.   In Rudolph's view the hospital's failure to recognize the level of service by Dr. Diehl and the Portland-based ENT resulted in a misrepresentation of the need for ENT services in MaineGeneral's service area.  In his own experience advising physicians concerning the financial viability of locating a private practice, physician clients rely upon the hospital's representation concerning the need for specific services, and rely on the hospital to do the required due diligence with regard to the specialty being recruited.

Dr. Hensen executed the Contract and agreed to work in MaineGeneral's service area because of the representations concerning the population service area, the opportunity to work hard, the representation of a need for ENT services by MaineGeneral, and because he was dissatisfied with his position at Greenbriar Valley Medical Center (GVMC) in West Virginia because the practice did not see enough patients to support his required salary of $300,000.00 per year. MaineGeneral executed the Contract to more efficiently use its facilities, including its operating room in Augusta, where the other practicing ENTs do not perform surgery, and to meet what MaineGeneral perceived as the need for additional ENT services in the area.

When Dr. Hensen was recruited, MaineGeneral was aware that his desire was to work hard and have a busy practice. Dr. Hensen left his practice at GVMC because there were not enough patients to support a practice that would generate a $300,000.00 income. Dr. Hensen left the Augusta area because he did not have sufficient patients to support his practice and because he was dissatisfied with MaineGeneral's handling of a breach of contract claim between himself and GVMC. Initially, Hensen believed that MaineGeneral had agreed to handle the negotiations with GVMC, but he became frustrated with the progress being made toward settlement of that claim. His difficulties at GVMC were discussed with Dr. Sears during his recruitment and prior to execution of the Contract.

## Discussion

"The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required." Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002). A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

8

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  Merch. Ins. Co., 143 F.3d at 7.  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trialworthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

MaineGeneral has filed a complaint in three counts, claiming breach of contract, unjust enrichment, and conversion.  Without discussing the elements of any of its claims, it has filed a five-page motion for summary judgment claiming it is entitled to summary judgment on the breach of contract claim.  Thus, for purposes of this motion I will not address either the unjust enrichment or conversion claims, but concentrate solely upon the claim of breach of contract.  Hensen has responded to the motion, essentially admitting the existence of the contract and his breach of its terms, but claiming, via his affirmative defenses, that the contract is void or voidable as the result of fraud, material misrepresentation, or mutual mistake.

Pursuant to well-settled Maine contract law, "a contract is not legally binding if both parties have entered into it laboring under a good-faith mistake of fact."  Burggraff v. Baum, 1998 ME 262, ¶ 7, 720 A.2d 1167, 1169 (distinguishing a mutual mistake of fact from a mutual mistake as to the legal significance of known facts).  To justify rescission of a voluntary agreement, "a mutual mistake of fact must relate to the circumstances that existed at the time the

contract was formed and not subsequent developments," Dufort v. Bangs, 644 A.2d 6, 7 (Me. 1994), and the mistake must also concern a material aspect of the agreement. Di Biase v. Universal Design & Builders, Inc., 473 A.2d 875, 878 (Me. 1984) (affirming contract rescission where "the shared misunderstanding . . . formed an implicit basis for entering the contract"). Id. As to the element of materiality, it has been said that rescission is available "if the parties contracted on the faith that a certain state of facts existed and that assumption proved erroneous." Id. at 879.

There is a question of fact as to whether or not Dr. Hensen and MaineGeneral made a mutual mistake about the need for another ENT specialist in the area. The undisputed evidence is that a population base of approximately 150,000 people is needed to support three full-time ENT specialists. Both the hospital and Hensen's expert appear to agree on that figure, Hensen contending the actual population is slightly less than that, the hospital possibly asserting the numbers are a little higher. The alleged "mutual mistake" is that neither the hospital nor Hensen were aware of the fact that Dr. Diehl and Dr. Payton together, separately performing both non-surgical and surgical functions on a part-time basis, amounted to a third full-time equivalent ENT already practicing in the area. Dr. Sears maintains that Diehl and Payton had only a minimal impact and the hospital's admitted failure to include them in its calculations was insignificant. Not surprisingly, Dr. Hensen sees it differently.

According to Hensen's expert, it is expected that the hospital would use due diligence in performing its calculations regarding the need for another specialist in the service area. The hospital does not deny this assertion and indeed believes that it used the requisite diligence in determining the need for Dr. Hensen's services and still believes that another ENT is needed in the area. In my view, these are questions of fact that must be resolved before judgment is

10

entered for either party.   Therefore, the motion for summary judgment (Docket No. 14) is denied.

    *So Ordered.*

    December 18, 2007                       /s/ Margaret J. Kravchuk
                                                  U.S. Magistrate Judge